UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

BRENDA L. IVY AND KEITH M. IVY                                         PLAINTIFFS

VS.                                                           CASE NO. _____

LEA M. BANNISTER, M.D. AND
MEMPHIS OBSTETRICS &
GYNECOLOGICAL ASSOCIATION, P.C.                                       DEFENDANTS

## COMPLAINT
### (Jury Trial Requested)

Come now the Plaintiffs, Brenda L. Ivy and Keith M. Ivy, by and through their attorneys,

Rozier Hayes, PLLC, and for their Complaint against the Defendants, Lea M. Bannister, M.D.,

and Memphis Obstetrics & Gynecological Association, P.C., state:

### PARTIES, JURISDICTION, AND VENUE

1.       Plaintiffs are residents and citizens of the State of Mississippi.

2.       Based on information and reasonable belief, Defendant Lea M. Bannister, M.D. is

a resident and citizen of the State of Tennessee.

3.       Dr. Bannister is a physician licensed to practice medicine in the State of

Tennessee and specializes in the practice of obstetrics and gynecology in Memphis, Tennessee.

4.       Defendant Memphis Obstetrics & Gynecological Association, P.C. ("MOGA") is

a professional corporation formed under the laws of the State of Tennessee and has its principle

place of business in Memphis, Tennessee.

5.       Based on information and reasonable belief, Dr. Bannister was an employee of

MOGA and was acting within the scope and course of her employment with MOGA at all times

relevant to this complaint.

6.     As described in more detail below, this is a health care liability action arising out of the provision of, and failure to provide, health care services by Dr. Bannister to Mrs. Ivy beginning March 2, 2011.

7.     This Court has personal jurisdiction over the Defendants, subject-matter jurisdiction pursuant to 28 U.S.C. § 1332 based on diversity of citizenship between the parties and damages in excess of $75,000.00, exclusive of interest and costs, and venue pursuant to 28 U.S.C. § 1391.

FACTS

8.     Plaintiffs are, and were at all times relevant to this Complaint, husband and wife.

9.     Mrs. Ivy entered into a professional medical relationship with Dr. Bannister and MOGA several years prior to the acts and omissions of medical negligence that give rise to this action.

10.     On January 5, 2011, Mrs. Ivy presented to the offices of MOGA and was seen by Dr. Bannister for evaluation and treatment of complaints of pelvic pain, cramping, and irregular cycle.

11.     By that time, Dr. Bannister knew that Mrs. Ivy had a significant history of abdominal surgeries and abdominal adhesions.

12.     Dr. Bannister examined Mrs. Ivy and subsequently determined that she was suffering from endometriosis, a medical condition in which cells from the lining of the uterus (endometrium) appear and flourish outside the uterine cavity.

13.     Dr. Bannister recommended a laparoscopic endometrial ablation procedure and explained to Mrs. Ivy that a laparoscopic procedure was preferable to an open procedure due to its less-invasive nature and quicker recovery time.

14.     Dr. Bannister assured Mrs. Ivy that she could perform the laparoscopic procedure on an outpatient basis and that no overnight stay would be required.

15.     Based on Dr. Bannister's recommendation and assurances, Mrs. Ivy agreed to the laparoscopic procedure.

16.     The laparoscopic procedure was scheduled for March 2, 2011, at Baptist Memorial Women's Hospital in Memphis, Tennessee ("BMHW").

17.     Mrs. Ivy reported to BMHW on March 2, 2011, as instructed by Dr. Bannister.

18.     Dr. Bannister began the laparoscopic procedure by inserting laparoscopic instruments into Mrs. Ivy's abdomen and soon encountered significant abdominal adhesions encompassing loops of the bowel.

19.     Dr. Bannister started adhesiolysis of the bowel loops but decided to terminate the procedure due to the significant degree of pelvic adhesive disease of the bowel in proximity and adhesed to the uterus.

20.     While removing the laparoscopic instruments, Dr. Bannister was informed by surgical personnel that free air was filling the Foley bag that was being used for urine collection during the procedure.

21.     Dr. Bannister then decided to reinsert the laparoscopic instruments and perform the ablation procedure.

22.     Following completion of the ablation procedure, Dr. Bannister determined that she had injured Mrs. Ivy's bladder.

23.     Dr. Bannister then transformed the laparoscopic procedure to an open procedure to investigate and repair the bladder injury.

24.     Dr. Bannister made a transverse incision in Mrs. Ivy's lower abdomen and began her investigation of the bladder injury.

25.     Upon opening the abdomen, Dr. Bannister visually inspected Mrs. Ivy's bladder and found that it had been perforated in two places during the course of the laparoscopic procedure.

26.     Dr. Bannister repaired the wounds to Mrs. Ivy's bladder, closed the incision, and terminated the surgical procedure.

27.     Dr. Bannister did not visually or manually inspect Mrs. Ivy's bowel prior to closing the incision and terminating the surgical procedure.

28.     Due to the surgical complications, Mrs. Ivy was admitted to BMHW for observation by Dr. Bannister.

29.     Almost immediately after the surgical procedure was completed, it was noted that Mrs. Ivy was suffering from abdominal distention and a mild ileus.

30.     Mrs. Ivy's condition kept getting worse and by March 4, 2011, she began experiencing sustained tachycardia and an elevated temperature of 101.

31.     Mrs. Ivy was then transferred to the Intensive Care Unit at BMHW where she continued to be monitored by Dr. Bannister.

32.     Despite Mrs. Ivy's worsening medical condition, Dr. Bannister ordered Mrs. Ivy out of the Intensive Care Unit for less-intensive nursing care.

33.     Mrs. Ivy's condition continued to deteriorate to the point that Dr. Bannister ordered Mrs. Ivy back to the Intensive Care Unit.

34.     Dr. Bannister ordered a CT scan on March 6, 2011, which revealed fluid accumulations in the abdominal area with a concern of bowel obstruction or injury.

4

35.    A nasogastric tube was placed which returned 250 cc of bilious material from Mrs. Ivy's stomach.

36.    Despite these worsening symptoms and objective findings, Dr. Bannister continued to monitor Mrs. Ivy without seeking definitive treatment for her condition.

37.    By the evening of March 6, 2011, Ms. Ivy's condition became so grave that Dr. Bannister decided to transfer her to Baptist Memorial Hospital Memphis ("BMHM") for a general surgery consultation.

38.    Mrs. Ivy was transferred to BMHM by ambulance late on March 6, 2011, and was seen there by a general surgeon, Dr. Carter McDaniel, for investigation and treatment of her condition on March 7, 2011.

39.    Dr. McDaniel took Mrs. Ivy to surgery and found two perforations in her bowel where Dr. Bannister performed surgery five days earlier.

40.    The bowel perforations were caused by Dr. Bannister during surgery on March 2, 2011.

41.    Dr. McDaniel also found that the bowel was actively leaking intestinal fluid into the abdominal cavity through the two perforations.

42.    Dr. McDaniel removed 20 centimeters (almost 8 inches) of Mrs. Ivy's bowel in order to repair the damage caused by Dr. Bannister.

43.    Dr. McDaniel then determined that the bowel was so injured and edematous that he could not safely close the incision in Mrs. Ivy's abdomen and elected to end the procedure with the abdomen left open.

44.    The section of bowel removed by Dr. McDaniel was sent to pathology for evaluation.

45.    Pathology determined that the bowel had been perforated and described it as displaying gangrene and acute peritonitis.

46.    Mrs. Ivy's post-operative course was medically unstable and she was placed on a ventilator.

47.    Mrs. Ivy could not be removed from the ventilator due to respiratory failure and overwhelming sepsis.

48.    Mrs. Ivy remained in guarded condition in the ICU for many days following the surgical repair by Dr. McDaniel and was required to remain on a ventilator.

49.    Mrs. Ivy underwent many surgical procedures to close her abdomen, including placement of a mesh over her open abdomen and a tracheotomy due to overwhelming sepsis and respiratory failure.

50.    On April 25, 2011, Ms. Ivy underwent yet another surgical procedure whereby her open abdomen was closed by way of a full-thickness skin graft.

51.    Despite closure of the surgical wound, Mrs. Ivy's bowel still protruded out of her abdomen.

52.    Mrs. Ivy underwent other surgeries to close the wound and repair the incision in her abdomen.

53.    Mrs. Ivy was discharged from BMHM on May 19, 2011 and transferred to Baptist Memorial Hospital in Desoto, Mississippi ("BMHD"), for further medical care, treatment, and rehabilitation services closer to her family.

54.    Mrs. Ivy was discharged from BMHD on June 3, 2011, but has been readmitted on numerous other occasions for medical care and treatment of her injuries.

55.     Mrs. Ivy received home health care after her first discharge from BMHD on June 3, 2011, and continues to receive such care.

56.     Mrs. Ivy will at some point undergo plastic surgery to repair her abdomen and will require sustained medical care for the rest of her life.

<u>COUNT I:  MEDICAL NEGLIGENCE</u>

57.     At all times relevant herein, Dr. Bannister owed a duty to provide medical care to Mrs. Ivy in accordance with the recognized standard of acceptable professional practice in the profession and the specialty thereof that she practices in the community in which she practices or in a similar community at the time of the alleged injuries and wrongful actions occurred.

58.     Dr. Bannister acted with less than, and failed to act with, ordinary and reasonable care in accordance with such standard in the following respects:

        A.     Knowing that Mrs. Ivy had a significant history of abdominal surgeries and abdominal adhesions, and after discovering and repairing the bladder injury during the laparoscopic procedure, Dr. Bannister failed to check the bowel for injuries before concluding the initial surgery;

        B.     Dr. Bannister failed to properly evaluate, assess, and respond to the clinical signs and symptoms exhibited by Mrs. Ivy post-operatively, particularly the clear signs and symptoms of sepsis; and

        C.     Dr. Bannister failed to specifically inform Mrs. Ivy of the enhanced risk of complications associated with a laparoscopic procedure due to her history of abdominal surgeries and abdominal adhesions.

59.     As a direct and proximate result of Dr. Bannister's negligent acts and omissions, Mrs. Ivy suffered injuries which would not otherwise have occurred.

7

60.     Specifically, if Dr. Bannister had checked the bowel for injuries before concluding the initial surgery, she would have found and repaired the bowel injury sustained by Mrs. Ivy during that surgery.

61.     As a direct and proximate result of Dr. Bannister's failure to check the bowel for injuries before concluding the initial surgery, the bowel injury was not discovered and repaired during that surgery and Mrs. Ivy suffered a significant delay in treatment and significant medical injuries and life-altering complications.

62.     In addition, Mrs. Ivy's septic condition was directly and proximately caused by the injury to her bowel during the initial surgery.

63.     Moreover, the failure of Dr. Bannister to recognize the signs and symptoms of sepsis and correlate them to sepsis resulting from the underlying bowel injury directly and proximately caused a significant delay in treatment and significant medical injuries and complications to Mrs. Ivy which would have been avoided if Dr. Bannister had met the applicable standards of care.

64.     If Dr. Bannister had specifically informed Mrs. Ivy of the enhanced risk of complications associated with a laparoscopic procedure due to her history of abdominal surgeries and abdominal adhesions, Mrs. Ivy would have elected an open procedure and would not have sustained an injury to her bowel.

65.     As a direct and proximate result of Dr. Bannister's negligence, Mrs. Ivy has suffered the following damages:

   A.     Past and future medical expenses;

   B.     Past and future pain and suffering;

   C.     Past and future emotional distress and mental anguish;

D.      Scarring;

E.      Disfigurement;

F.      Loss of enjoyment of life;

G.      Permanent disability; and

H.      Economic damages.

## COUNT II:  LOSS OF CONSORTIUM

66.     The injuries and disabilities suffered by Mrs. Ivy have significantly impacted and damaged Mr. Ivy and his marital relationship.

67.     As a direct and proximate result of Dr. Bannister's negligence, Mr. Ivy has suffered the following damages:

A.      Past and future loss of marital services;

B.      Past and future loss of companionship and society, and

C.      Past and future loss of wages.

## COUNT III:  RESPONDEAT SUPERIOR

68.     Because Dr. Bannister was an employee of MOGA and was acting within the course and scope of her employment with MOGA at all times relevant to this action, the negligence of Dr. Bannister is imputed to MOGA.

69.     As a result, MOGA is liable for all damages sustained by Mrs. Ivy and Mr. Ivy under the doctrine of *respondent superior*.

## JURY DEMAND

70.     Plaintiffs demand a jury trial with respect to all issues of fact that may arise in this action.

9

## COMPLIANCE WITH STATUTORY NOTICE REQUIREMENTS

71.     The Plaintiffs have complied with the notice requirements set forth in Tenn. Code Ann. § 29-26-121(a) as set forth in the Affidavit of Counsel filed along with Complaint.

72.     On February 16, 2012, the notice of claim letter attached as Exhibit "A" was served on Dr. Bannister by personal delivery on Ami Jennings, a person who identified her job functions as including receptionist for deliveries to Dr. Bannister and receptionist for arrival of Dr. Bannister's patients at her current practice location.

73.     Proof of personal delivery of said notice of claim letter to Ms. Jennings is demonstrated by the Affidavit of Process Server attached as Exhibit "B".

74.     On February 14, 2012, the notice of claim letter attached as Exhibit "C" was mailed to Dr. Bannister by certified mail, return receipt requested.  Proof of mailing is further demonstrated by the certificate of mailing from the United States postal service stamped with the date of mailing attached as Exhibit "D".

75.     On February 15, 2012, the notice of claim letter attached as Exhibit "C" was received by Dr. Bannister's office as demonstrated by the domestic return receipt attached as Exhibit "E".

76.     On February 16, 2012, the notice of claim letter attached as Exhibit "F" was served on Defendant Memphis Obstetrics & Gynecological Association, P.C. ("MOGA") by personal delivery on Ami Jennings, a person who identified her job functions as including receptionist for deliveries to MOGA and receptionist for arrival of its patients at its current practice location.

77.     Proof of personal delivery of said notice of claim letter to Ms. Jennings is demonstrated by the Affidavit of Process Server attached as Exhibit "G".

78.     On February 14, 2012, the notice of claim letter attached as Exhibit "H" was mailed to MOGA by certified mail, return receipt requested.  Proof of mailing is further demonstrated by the certificate of mailing from the United States postal service stamped with the date of mailing attached as Exhibit "I".

79.     On February 15, 2012, the notice of claim letter attached as Exhibit "H" was received by MOGA as demonstrated by the domestic return receipt attached as Exhibit "J".

80.     According to records maintained by the Tennessee Secretary of State, George F. Wortham, III, M.D., was MOGA's registered agent on February 14, 2012, and has served as its registered agent since that time.

81.     On February 16, 2012, the notice of claim letter attached as Exhibit "K" was served on George F. Wortham, III, M.D., in his capacity as MOGA's registered agent, by personal delivery on Carol Byrd, a person who identified her job functions as including receptionist for deliveries to George F. Wortham, III, M.D., in his capacity as MOGA's registered agent.

82.     Proof of personal delivery of said notice of claim letter to Ms. Byrd is demonstrated by the Affidavit of Process Server attached as Exhibit "L".

83.     On February 14, 2012, the notice of claim letter attached as Exhibit "M" was mailed to George F. Wortham, III, M.D., in his capacity as MOGA's registered agent, by certified mail, return receipt requested.  Proof of mailing is further demonstrated by the certificate of mailing from the United States postal service stamped with the date of mailing attached as Exhibit "N".

84.     On February 15, 2012, the notice of claim letter attached as Exhibit "M" was received by Carol Byrd on behalf of George F. Wortham, III, M.D., in his capacity as MOGA's registered agent, as demonstrated by the domestic return receipt attached as Exhibit "O".

## COMPLIANCE WITH STATUTORY GOOD FAITH REQUIREMENTS

85.     The Plaintiffs have complied with the good faith requirements set forth in Tenn. Code Ann. § 29-26-122.

86.     A Certificate of Good Faith, which documents Plaintiffs' compliance with the good faith requirements set forth in Tenn. Code Ann. § 29-26-122, is being filed with the Court along with this Complaint.

WHEREFORE, the Plaintiffs, Brenda L. Ivy and Keith Ivy, pray for judgment against the Defendants, jointly and severally, for all damages described herein, which exceed $75,000.00, exclusive of interest and costs, for their costs herein expended, including attorney's fees, and for all other relief to which they may be entitled.

Respectfully submitted,

**BRENDA L. IVY AND KEITH M. IVY,**
Plaintiffs

ROZIER HAYES, PLLC
5740 Getwell Road
Building 9
Suite A
Southaven, MS  38672
662-890-6909 (phone)
662-890-6928 (fax)

By: _____
Robert E. Hayes, Jr. (TN Bar No. 027730)
rhayes@rohalaw.com